United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 14, 2003**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 01-50154

_____

ISABEL G. ANDRADE; ET. AL.,

Plaintiffs,

STEPHEN E. THOMPSON, as administrator for the following estates:
Estate of Chanel Andrade, Estate of Crystal Barrios, Estate of
Isaiah Barrios, Estate of Dayland Lord Little, Estate of Kara
Brittani (Pages) Little, Estate of Abigail Martinez, Estate of
Audrey Martinez, Estate of Joseph Martinez, Estate of Melissa
Morrison, Estate of Mayanah Schneider, Estate of Aisha Gyarfas
Summers, Estate of Startle Summers, Estate of Hollywood Sylvia,
Estate of Rachel Sylvia; DANIEL MARTINEZ, SR.; THOMAS BARRIOS;
MISTY DAWN FERGUSON; STANLEY SYLVIA; NORMAN WASHINGTON ALLISON;
ADELINE SYLVIA BLACK; LOWESS ESMERELLA BLAKE; ROBERT THEOPHILUS
BLAKE; DEBBORAH BROWN, ET. AL.,

Plaintiffs - Appellants

v.

PHILLIP J. CHOJNACKI; ET. AL.,

Defendants,

UNITED STATES OF AMERICA,

Defendant - Appellee.
_____

JEAN HOLUB, Co-Administrator & Legal Representative of
Esates of Bobbie Lane Koresh, Star Hadassah Howell &
Cyrus Ben Joseph Howell Minors, Deceased,

Plaintiff - Appellant,

v.

JANET RENO, Attorney General; ET AL

Defendants

JANET RENO, Attorney General; PHILLIP J. CHOJNACKI; JEFFREY J. JAMAR; ROBERT RICKS; RICHARD (DICK) ROGERS;

Defendants - Appellees.

_____

MISTY DAWN FERGUSON; ET AL,

Plaintiffs,

MISTY DAWN FERGUSON; ROBERT THEOPHILUS BLAKE; LOWESS ESMERELLA BLAKE; DEBBORAH K. BROWN, SHERRY H. BURGO; ET. AL.,

Plaintiffs - Appellants,

V.

JANET RENO, Attorney General; ET. AL.,

Defendants,

JANET RENO, Attorney General; WILLIAM S. SESSIONS; LAWRENCE A. POTTS; DANIEL M. HARTNETT; EDWARD DANIEL CONROY; DAVID C. TROY; PHILLIP J. CHOJNACKI; CHARLES A. SARABYN; PETER B. MASTIN; TED ROYSTER; JAMES CAVANAUGH; EARL K. DUNAGAN; DARREL DYER; WILLIAM BUFORD; DAVY AGUILERA; JEFFREY J. JAMAR; ROBERT A. (BOB) RICKS; OLIVER B. REVELL; RICHARD (DICK) ROGERS; LON T. HORIUCHI; BYRON SAGE; STEPHEN E. HIGGINS; UNITED STATES OF AMERICA,

Defendants - Appellees.

_____

DEBBORAH BROWN, ROBYN BUNDS, Individually and on behalf of minor child Shaun Wisdom Howell Koresh; SHERRY HOUTMAN BURGO; CLIVE DOYLE; KATHERINE FARRIS; ET. AL.,

Plaintiffs - Appellants,

V.

UNITED STATES OF AMERICA; ET. AL.,

Defendants,

UNITED STATES OF AMERICA; JANET RENO, Attorney General; WILLIAM S. SESSIONS; LAWRENCE POTTS; STEPHEN HIGGINS;

DANIEL HARTNETT; DANIEL CONROY; DAVID C. TROY; PHILLIP CHOJNACKI; CHARLES (CHUCK) SARABYN; PETER MASTIN; TED ROYSTER; JAMES CAVANAUGH; EARL DUNAGAN; DARREL DYER; WILLIAM BUFORD; DAVY AGUILERA; JEFFREY JAMAR; ROBERT RICKS; OLIVER REVELL; RICHARD (DICK) ROGERS; LON T. HORIUCHI; BYRON SAGE; TIMOTHY GABORIE; JOHN MCGAW; WILLIAM T JOHNSTON,

Defendants - Appellees.
_____

JAMES LOYE RIDDLE; ET. AL.,

Plaintiffs,

MYRTLE ANN RIDDLE,

Plaintiff - Appellant,

V.

JANET RENO, Attorney General; ET. AL.,

Defendants,

JANET RENO, Attorney General; WEBSTER L. HUBBELL; WILLIAM S. SESSIONS; LAWRENCE A. POTTS; STEPHEN E. HIGGINS, Director, ATF; DANIEL CONROY; DAVID C. TROY; PHILLIP J. CHOJNACKI; CHARLES A. SARABYN; PETER B. MASTIN; TED ROYSTER; JAMES CAVANAUGH; EARL K. DUNAGAN; DARREL DYER; WILLIAM BUFORD; DAVY AGUILERA; JEFFREY JAMAR; ROBERT A. (BOB) RICKS; OLIVER B. REVELL; RICHARD ROGERS; LON T. HORIUCHI; BYRON SAGE; UNITED STATES OF AMERICA,

Defendants - Appellees.
_____

OLIVER GYARFAS, Individually and as Administrator of the Estate of Aisha Gyafas Summers Deceased and of the Estate of Startle Summers Deceased; ELIZABETH GYARFAS, Individually and as Administrator of the Estate of Aisha Gyarfas Summers Deceased and of the Estate of Startle Summers Deceased,

Plaintiffs - Appellants,

V.

3

UNITED STATES OF AMERICA,

Defendant - Appellee.
_____
JEAN HOLUB, Co-Administrators and Legal Representatives
of the Estates of Bobbie Layne Koresh, Star Hadassah
Howell and Cyrus Ben Joseph Howell, Minor Children
Deceased; BOBBY WAYNE HOWELL, Co-Administrators and Legal
Representatives of the Estates of Bobbie Layne Koresh,
Star Hadassah Howell and Cyrus Ben Joseph Howell, Minor
Children Deceased,

Plaintiffs - Appellants,

V.

UNITED STATES OF AMERICA,

Defendant - Appellee.
_____
DEBBORAH BROWN; SHERRY HOUTMAN BURGO; CLIVE DOYLE;
TILLIE FRIESEN; FLOYD HOUTMAN, JR.; ET. AL.,

Plaintiffs - Appellants,

V.

UNITED STATES OF AMERICA,

Defendant - Appellee.
_____
STANLEY SYLVIA; ET. AL.,

Plaintiffs,

STANLEY SYLVIA; NORMAN WASHINGTON ALLISON;
LUCILLE MAYNARD; ADELINE SYLVIA BLACK;
LOWESS ESMERELLA BLAKE; ET. AL.

Plaintiffs - Appellants,

V.

UNITED STATES OF AMERICA

4

_____

**Appeal from the United States District Court
for the Western District of Texas**
_____


Before JONES, WIENER, and DeMOSS, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellants, some of the survivors and estates of Branch Davidians who died during the 1993 conflict at Mount Carmel near Waco, Texas, attempted to prove at trial that the United States government should be held liable under the Federal Tort Claims Act ("FTCA") for deaths and injuries of Branch Davidian sect members during the siege of their compound outside Waco, Texas on April 19, 1993. The court, after a month-long trial, rejected their case. The court found that the government's planning of the siege – i.e. the decisions to use tear gas against the Davidians; to insert the tear gas by means of military tanks; and to omit specific planning for the possibility that a fire would erupt – is within the "discretionary function exception" to the government's waiver of immunity. The court also found that the use of tear gas was not negligent. Further, even if the United States was negligent by causing damage to the compound before the fires broke out, thus either blocking escape routes or enabling the fires to speed faster, such negligence did not legally cause the plaintiffs' injuries because some of the Davidians started the fires. The

5

court found that the FBI's decision not initially to allow fire trucks on the property was reasonable because of the risk of injury or death to firefighters who might encounter hostile gunfire from the Davidian compound.

All of these findings and conclusions, and other claims that the court earlier dismissed, were the subject of intense and provocative dispute before the trial court, as they have more generally been to the public ever since that shameful day in American law enforcement. None of the substantive issues are raised in this appeal, however. Instead, Appellants' only serious contention is that Judge Smith — on account of his relationships with defendants, defense counsel, and court staff; prior judicial determinations; and comments during Appellants' trial — should have recused himself from hearing their claims. We conclude that Appellants' allegations do not reflect conduct that would cause a reasonable observer to question Judge Smith's impartiality; they do not necessitate vacatur under the law of judicial recusal and the correct standards of review. This court **AFFIRMS** the take-nothing judgment.

## BACKGROUND

In the wake of the bloody warrant service, siege, and conflagration of the Branch Davidian compound at Mount Carmel in the spring of 1993, four lawsuits were tried by Judge Smith. One was the criminal prosecution of eleven surviving Davidians for the

events surrounding the deaths of four ATF agents (<u>Branch</u>). Two were civil actions. One was brought by an ATF undercover agent against fellow federal employees and a psychiatrist. The other was brought by federal agents (or their estates) against a reporter, media organizations, and an ambulance service, asserting that the defendants had caused their injuries by alerting Davidians of the impending raid (<u>Risenhoover</u>). The fourth is the instant suit, a set of civil actions brought by surviving Davidians and estates of the deceased against the federal government and various other parties.

This suit did not, however, originate in Judge Smith's court. The plaintiffs instead filed suit in Houston, in the Southern District of Texas. The defendants' motion to transfer to Judge Smith's court in the Waco Division of the Western District of Texas was granted. In addition to finding Waco the most convenient forum, the transferring judge dismissed the plaintiffs' allegations of bias. She wrote at the time:

> In effect, Plaintiffs' argument is a collateral motion for recusal, and this Court declines to render a formal ruling on that issue. The merits should be heard upon motion in the Western District of Texas. Plaintiffs' evidence of bias based solely on Judge Smith's prior rulings, [sic] does not create a basis for denial of transfer in this case.

<u>Andrade v. Chojnacki</u>, 934 F. Supp. 817, 835 (S.D. Tex. 1996).

The plaintiffs continued their efforts to avoid Judge Smith's court even after the transfer back to Waco. On the day following Judge Smith's consolidation of their suits, plaintiffs

7

filed a "Motion to Transfer to San Antonio Division or, Alternatively, to Recuse Judge Walter S. Smith, Jr." (hereinafter "First Motion to Recuse"). Judge Smith held a hearing on the motion on June 7, 1996, and denied it eight months later. The plaintiffs then unsuccessfully petitioned this court for a writ of mandamus seeking recusal or transfer to a different venue.

Judge Smith prepared the case for trial. He issued a Memorandum Opinion and Order which dismissed a number of the plaintiffs' claims, narrowing the issues for trial down to several FTCA claims against the United States. Andrade v. Chojnacki, 65 F. Supp. 2d 431 (W.D. Tex. 1999). He scheduled discovery and submission of a joint pre-trial order, and set trial to begin in October 1999. The trial was later rescheduled for the following summer. Upon plaintiffs' motion, Judge Smith empaneled an advisory jury and conducted the trial of plaintiffs' remaining FTCA claims against the United States from June 19 through July 14, 2000. The advisory jury found that the United States had not acted negligently in any respect.

Plaintiffs filed a Second Motion to Recuse on September 12, 2000, while the case was under submission. Judge Smith issued a judgment rejecting plaintiffs' FTCA claims in their entirety on September 20; he amended it one week later. In addition to findings of fact and conclusions of law, the revised opinion contained Judge Smith's rationale for denying plaintiffs' Second

8

Motion to Recuse.  <u>Andrade v. United States</u>, 116 F. Supp. 2d 778 (W.D. Tex. 2000).  The plaintiffs timely appealed to this court.

Before proceeding, we note that there are two sets of appellants.  The group represented by Ramsey Clark and Lawrence W. Shilling (the "Brown Appellants") had its claims dismissed by Judge Smith's July 1999 Memorandum Opinion and Order.  <u>Andrade v. Chojnacki</u>, 65 F. Supp. 2d 431 (W.D. Tex. 1999).  Judge Smith partially reinstated these claims on April 21, 2000.  The other group is represented by Michael A. Caddell, Cynthia B. Chapman, and James Juranek (the "Andrade Appellants").

**STANDARD OF REVIEW**

This court reviews denials of motions to recuse for abuse of discretion.  <u>Trevino v. Johnson</u>, 168 F.3d 173, 178 (5th Cir. 1999).  The judge abuses his discretion in denying recusal where "a reasonable man, cognizant of the relevant circumstances surrounding [the] judge's failure to recuse, would harbor legitimate doubts about that judge's impartiality."  <u>United States v. Bremers</u>, 195 F.3d 221, 226 (5th Cir. 1999).  Requests for recusal raised for the first time on appeal are generally rejected as untimely.  <u>United States v. Sanford</u>, 157 F.3d 987, 988-89 (5th Cir. 1998).

Conclusions of law are reviewed <u>de novo</u>, <u>Hart v. Bayer Corp.</u>, 199 F.3d 239, 243 (5th Cir. 2000), and evidentiary and discovery-related rulings for abuse of discretion, <u>Munoz v. Orr</u>, 200 F.3d 291, 300 (5th Cir. 2000).

9

**DISCUSSION**

I.   **Judicial Recusal**

   A.   **General Principles**

   Under 28 U.S.C. § 455 (2000), a party may request the recusal of a judge not only if "he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," id. § 455(b)(1), but also when "his impartiality might reasonably be questioned," id. § 455(a). These provisions afford separate, though overlapping, grounds for recusal. Subsection (b)(1) pertains to specific instances of conflicts of interest, while subsection (a) deals with the appearance of partiality generally. Further, whenever a judge's partiality might reasonably be questioned, recusal is required under § 455(a), irrespective whether the circumstance is covered by § 455(b). Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 860 n.8 (1988).

   Caselaw has articulated several interpretative guidelines for this statute. One of the relevant maxims is that the standard for bias is not "subjective," as it once was, but, rather, "objective." See Vieux Carre Prop. Owners, Residents & Assocs. v. Brown, 948 F.2d 1436, 1448 (5th Cir. 1992). Courts moved to this less deferential standard in response to Congress's 1974 revisions to the 1948 statute, and it is with reference to the "well-informed, thoughtful and objective observer, rather than the

10

hypersensitive, cynical, and suspicious person" that the objective standard is currently established.  <u>United States v. Jordan</u>, 49 F.3d 152, 156 (5th Cir. 1995).

Another maxim is that review should entail a careful consideration of context, that is, the entire course of judicial proceedings, rather than isolated incidents.  <u>Sao Paulo State of the Federative Rep. of Brazil v. Am. Tobacco Co.</u>, 535 U.S. 229, 232-33, 122 S. Ct. 1290, 1292 (2002); <u>United States v. Avilez-Reyes</u>, 160 F.3d 258, 259 (5th Cir. 1998).

Finally, the origin of a judge's alleged bias is of critical importance.  In 1994, the Supreme Court applied a common-law doctrine commonly called the "extrajudicial source rule" to the interpretation of § 455.  <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994).  As articulated by the Supreme Court, this rule more or less[1] divides events occurring or opinions expressed in the course of judicial proceedings from those that take place outside of the litigation context and holds that the former rarely require recusal:

> First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion. In and of themselves (<u>i.e.</u>, apart from surrounding comments or accompanying opinion), they cannot possibly

---

[1]The Court's opinion observes that the "extrajudicial source doctrine" and its exceptions are designed to isolate instances where a judge exhibits "wrongful" or "inappropriate" bias or prejudice and such instances will most often, though not always, arise from knowledge gained or relationships existing outside formal proceedings before the judge.  <u>Liteky</u>, 510 U.S. at 488.

11

show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They <u>may</u> do so if they reveal an opinion that derives from an extrajudicial source; and they <u>will</u> do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible."

<u>Id.</u> at 555 (internal citations and footnotes omitted).

Appellants sought Judge Smith's recusal under § 455(a) and (b)(1). Their success depends upon their ability to clear the foregoing hurdles. They must (1) demonstrate that the alleged comment, action, or circumstance was of "extrajudicial" origin, (2) place the offending event into the context of the entire trial, and (3) do so by an "objective" observer's standard. Moreover, they must demonstrate that the district court's refusal to recuse was not merely erroneous, but, rather, an abuse of discretion. It is hardly surprising that they failed to clear them.

12

**B.     Extrajudicial Bias**

The Andrade Appellants specify fifteen events which, they argue, constitute their case for recusal.  By Appellants' own admission, eight of these are intrajudicial," thus requiring a more deferential review than that applicable to the seven of "extrajudicial" origin.    We turn first to the extrajudicial events.[2]

**1.     Events and Circumstances Beyond Judge Smith's Control**

Two of the seven "extrajudicial" events – both beyond Judge Smith's control — may be dismissed without exhaustive consideration.  One is trivial, the second moot.

The Andrade Appellants complain that over the course of the trial, government counsel occasionally gave T-shirts, food, beverages, cookies, and candies to employees in the federal clerk's, marshal's, and court reporter's offices.  In ruling upon the recusal motion, Judge Smith found that the T-shirts were part of "a prank played on a deputy marshal," and none of the recipients were "members of the Court's staff."  While Appellants maintain that the receipt of these gifts created an "appearance of impropriety," they do not challenge the accuracy of Judge Smith's

---

[2]   The government argues that several of the latter seven events ought more appropriately be characterized as having occurred during the judicial proceedings.  The government may well be correct in regard to some of the incidents, but for simplicity, we accept Appellants' characterization.

13

findings. We accept the uncontested findings of the district court, and fail to see how these small courtesies to the court's non-judicial staff could be viewed by any "objective" observer as compromising Judge Smith's independence.

The other allegation is that Judge Smith's longstanding relationships with two of the dismissed defendants, William Sessions and William Johnston, gave rise, at the very least, to the "appearance of impropriety." As an Assistant U.S. Attorney for the Western District of Texas, Johnston made frequent appearances before Judge Smith. Sessions, formerly the Director of the FBI, had served on the federal district court for the Western District of Texas from 1974-87; Judge Smith served with Sessions from 1983-87 while Sessions was Chief Judge. This issue is moot, as both Sessions and Johnston were dismissed from the case in July 1999. In any event, no facts are proven to suggest that either prior relationship evinces characteristics that would even suggest, much less mandate recusal. See Parrish v. Bd. of Comm'rs., 524 F.2d 98, 104 (5th Cir. 1975).

### 2. Comments Made By Judge Smith

The five other extrajudicial events can be divided into three categories: (a) the judge's alleged in camera statements to trial counsel, (b) his public comments regarding government attorneys Johnston and James Touhey, and(c) his alleged ex parte comments to reporter Lee Hancock.

14

### a. Judge Smith's Alleged <u>in camera</u> Comments

Judge Smith's alleged <u>in camera</u> statements, though said to violate §§ 455(a) and (b)(1), are unproblematic. On June 22, 2000, Appellants prepared to offer into evidence documents showing the FBI's failure to develop adequate plans to extinguish fire at the compound. These documents had been the subject of extensive pretrial wrangling. When Judge Smith announced his decision not to allow admission, the Andrade Appellants' counsel approached the bench and requested an <u>in camera</u> conference. During the conference, Judge Smith said that he had not read Appellants' proffered evidence. Somewhat later, as the litigants discussed the empaneling of an advisory jury, Judge Smith told Mr. Caddell that, "if you don't think I've got the guts to disregard the [advisory] jury's verdict, you're wrong." Appellants argue that these two statements contribute to their case for recusal.

Judge Smith's declaration that he had not read the evidence prior to denying its admissibility is of no legal import. Appellants offered the evidence to advance the proposition that the FBI could have — in fact, should have — planned for the possibility of fire. Such an argument is almost surely barred from consideration, however, by the discretionary function exception to the FTCA. 28 U.S.C. § 2680(a) (2000). Although the FTCA permits, in general, suits against the United States, it exempts the government from liability for "acts that are discretionary in

15

nature," those "involv[ing] an element of judgment or choice." United States v. Gaubert, 499 U.S. 315, 322 (1991) (quoting Berkovitz v. United States, 486 U.S. 531, 536 (1988)). Judge Smith had no need to examine the evidence supporting this claim, because the applicability of the discretionary function exception does not turn on evidence of the actual decisions made by the defendants, but, rather, on whether the decision is or is not "susceptible to policy analysis". Id. at 325; see also Baldassaro v. United States, 64 F.3d 206, 209 (5th Cir. 1995). In light of the law on this point, Judge Smith's preference not to read the evidence — and his declaration – cannot constitute evidence of bias or even the appearance of such.

This being said, Appellants were not without options. They might have appealed Judge Smith's decision to exclude this evidence and sought direct review of the applicability of the discretionary function exception. But they did not do so. Issues not raised on appeal are waived. United States v. Valdiosera-Godinez, 932 F.2d 1093, 1099 (5th Cir. 1991).

Equally unavailing is Appellants' allegation that Judge Smith's statement regarding his willingness to disregard the advisory jury's verdict manifests an impermissible judicial bias. The FTCA does not grant plaintiffs the right to a jury trial. 28 U.S.C. § 2402 (2000). Notwithstanding the clear congressional mandate that claims against the federal government are to be tried to the bench, Appellants moved for the empaneling of an advisory

16

jury; over the government's objection, Judge Smith honored the request. But he was under no obligation to accept its verdict. Sullivan v. Rowan Cos., 952 F.2d 141, 147 (5th Cir. 1992). His statement accurately, if bluntly, reflected the status of the advisory jury verdict. Even if Appellants found this in-chambers statement offensive, their claims are to be judged by an objective standard. The statement is neither "grossly inappropriate" nor "patently offensive," as required by our precedent. In re Chevron U.S.A., Inc., 121 F.3d 163, 165–67 (5th Cir. 1997).

### b.   Judge Smith's Public Comments

Appellants also point out Judge Smith's comments regarding William Johnston and his compliment toward James Touhey to advance their case for recusal. We reject the arguments.

As mentioned above, Johnston was one of the original defendants to this lawsuit. While the case was before the district court, a Special Counsel from within the Justice Department investigated Johnston for allegedly withholding evidence from defendant Davidians during their criminal trial. According to a newspaper report, Judge Smith was upset by the investigators' treatment of Johnston (the article used the term "witch hunt" to describe Judge Smith's view). In response, Judge Smith told several investigators in September 2000 that he would no longer cooperate with the inquiry and that he would not permit the investigators to carry firearms into the courthouse. The Special

17

Counsel subsequently visited Judge Smith in his chambers to repair the rift. The judge's comments, however, are irrelevant to Appellants' case for recusal, as Johnston had been dismissed from this case in July 1999 — 15 months before this incident occurred.

Appellants argue that Judge Smith's public compliment of James Touhey, a government attorney, supports mandatory recusal under §§ 455(a) and (b)(1). According to Appellants, Touhey conducted a "particularly vicious cross-examination of Davidian witness Clive Doyle," in which Doyle was "reduced to tears." During the subsequent recess and outside the presence of the jury, Appellants' counsel observed Judge Smith enter the courtroom, pat Touhey on the back, shake his hand, and congratulate him, saying "Good job, Mr. Touhey!"

Appellants acknowledge that a judge's "compliments in the course of legal proceedings should not ordinarily support a partiality challenge," Certain Underwriters at Lloyd's London v. Oryx Energy Co., 944 F. Supp. 566, 568 (S.D. Tex. 1996), but they view the relationship reflected here between Touhey and Smith as exceptional. Doyle had been charged with murder, tried before Judge Smith, and acquitted by the jury in the Davidians' criminal trial. With his compliment, Appellants argue, Judge Smith conveyed his gratitude to Touhey for Doyle's belated humiliation.

Appellants' argument fails for two reasons. First, not only does their brief omit citing the most prominent Supreme Court statement on point, Liteky, 510 U.S. at 555 ("judicial remarks that

18

are critical or disapproving of, or even hostile to, counsel for the parties or their cases, ordinarily do not support a bias or partiality challenge"), but they also neglect to discuss two relevant Fifth Circuit cases cited by the government. See United States v. Landerman, 109 F.3d 1053, 1066 (5th Cir. 1997) (affirming denial of motion to recuse where district judge allowed "the Government more leeway during its questioning and did interrupt defense counsel's questioning more often than the Government's questioning"); Garcia v. Woman's Hosp. of Texas, 143 F.3d 227, 230 (5th Cir. 1998) (affirming denial of motion to recuse where district judge had made unflattering comments about plaintiff's ability to prove her case). Second, in attributing to Judge Smith's compliment something more than "just a compliment," Appellants overlook that it is with reference to the "well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person" that inappropriate or wrongful bias is established. Jordan, 49 F.3d at 156. This court sees a compliment, not a subliminal message of wrongful bias. Accordingly, we find no grounds for recusal here.

### c. Judge Smith's Alleged ex parte Comments

On September 13, 2000, one week before Judge Smith issued his initial findings of fact and judgment denying Appellants' FTCA claims and two weeks before he ruled upon Appellants' Second Motion for Recusal, the Dallas Morning News published a story reporting

Appellants' filing of their second recusal motion. The article quotes attorney Caddell, describes his view of Judge Smith as biased, states that Caddell changed his earlier-expressed decision not to appeal because of the bias, and paraphrases at length the allegations in the recusal motion. Before assessing the likelihood that the motion would succeed, the article briefly speculates on the outcome of the case, based upon several of Judge Smith's alleged comments. The passage, in its entirety, reads as follows:

> FINAL RULING
>     Judge Smith has offered some indications that his final ruling will mirror the jury's decision.
>     Late in the four-week trial, he told a reporter that sect members broke the law by resisting the federal search and by refusing to surrender during the 51-day siege. He said those violations probably trumped plaintiffs' arguments that government agents acted negligently in efforts to end the standoff.
>     The judge noted he might be in "one hell" of a position with his decision to impanel an advisory jury for the type of civil case normally decided by a judge alone.
>     During the civil trial, the judge sometimes reacted emotionally to graphic evidence. After spending a weekend reviewing the government's excerpts from surveillance recordings made in the compound during the siege, he remarked during a break in the case that the tapes would "blow" the plaintiffs "out of the pond."

Lee Hancock, <u>Davidians' Attorney Vents Anger at Judge; Appeal Now Planned in Wrongful Death Suit</u>, Dallas Morning News, Sept. 13, 2002, at 25A.

Appellants contend that Judge Smith's alleged <u>ex parte</u> comments violated Canons 2(A), 3A(4) and 3A(6) of the Code of

Judicial Conduct.[3]  Conceding that violations of the Code do not necessarily give rise to a violation of § 455(a), they nevertheless argue that courts consistently "take a hard line for those involving judicial commentary on pending cases."  Three cases exemplify their position that reviewing courts have set a standard for unacceptable judicial misbehavior and mandatory recusal that readily encompasses Judge Smith's comments.  In re Boston's Children First, 244 F.3d 164 (1st Cir. 2001); United States v. Microsoft Corp., 253 F.3d 34, 114 (D.C. Cir. 2001); United States v. Cooley, 1 F.3d 985, 988 (10th Cir. 1993).  These are serious charges, but because Appellants never brought this article to the district court's attention, their fulminations lack record support and context.  We cannot review this claim.

Two full weeks passed between publication of the article and Judge Smith's final ruling on Appellants' motions for reconsideration and recusal, but Appellants never moved to supplement their motion.  Nonetheless, they included a copy of the article in their Record Excerpts submitted to this court, in violation of Fed. R. App. P. 10(e)(2)(C).  See United States v. Page, 661 F.2d 1080, 1082 (5th Cir. Nov. 1981).  We retain discretion to grant Appellants' motion to supplement the record in

---

[3]  Code of Conduct for United States Judges, 175 F.R.D. 363, 365–367 (1997).

this court,[4] but exercising that option raises another procedural hurdle, because untimely motions to recuse are ordinarily rejected. Sanford, 157 F.3d at 989. This aspect of Appellants' recusal claim is untimely, as Sanford holds, because it was raised only after an adverse judgment and for the first time on appeal.[5]

Cognizant of such problems, Appellants seek to compare their situation with that of Microsoft and its district judge, who repeatedly spoke with reporters concerning the merits of the case on the condition that the conversations be "embargoed" until the court released its decision. Microsoft Corp., 253 F.3d at 108. Because Microsoft had not learned of the court's ventures until opportunity for objection had passed, the Court of Appeals permitted Microsoft to raise the recusal issue on appeal and does not appear to have subjected it to a more stringent standard of review. Id.

---

[4] Pegues v. Morehouse Parish Sch. Bd., 706 F.2d 735, 738 (5th Cir. 1983); but cf. United States v. Okoronkwo, 46 F.3d 426, 435 (5th Cir. 1995).

[5] Sanford notes that this court has declined to craft a per se rule concerning untimeliness of recusal motions, but generally, such motions must be filed "at the earliest moment" after a movant receives knowledge of the facts suggesting disqualification. 157 F.3d at 938, (quoting Travelers Ins. Co. v. Liljiberg Enters., 38 F.3d 1404, 1410 (5th Cir. 1994)). Sanford also notes this court's reluctance to employ a plain error standard of review to untimely recusal motions. Id. at 989; see United States v. Gray, 105 F.3d 956, 968 (5th Cir. 1997) (plain error review utilized "for the sake of argument"); United States v. York, 888 F.2d 1050, 1056 (5th Cir. 1989). The remainder of the above discussion makes clear that even if we employed plain error "for the sake of argument," Appellants' contentions regarding the newspaper article are meritless.

22

Any comparison with Microsoft is wholly unpersuasive. There is no evidence that if Judge Smith gave an interview, he enforced silence on the Dallas Morning News reporter. On the contrary, his comments were published, it appears, shortly after they were made and sufficiently before the district court's final ruling. Even more obvious is that Appellants' counsel had given an interview to the reporter to highlight the filing of his second motion to recuse. Mr. Caddell is prominently and directly quoted in the article. It is near impossible to believe that notwithstanding his willingness to publicize the filing of the second motion to recuse, on the eve of the court's expected ruling on the merits, Appellants' counsel did not even bother to check whether the reporter (who covered the case throughout trial) had written an article. The Dallas Morning News enjoys an excellent reputation and is read statewide; the paper had been diligently covering the trial; the article was at least constructively available before Judge Smith ruled. These circumstances distinguish the instant case from Microsoft.

Appellants' argument ultimately asks this court to judge the judge based exclusively on the fact of publication of his remarks, without context and without verification of their accuracy. It is hardly clear whether Judge Smith actually gave an interview or spoke off the cuff, and whether his comments were made in chambers or on the bench, ex parte or to a group of listeners, yet Appellants have jumped to the conclusion that he violated the

23

judicial Code of Conduct in several ways by giving an interview. But there is no way of knowing what generated the article, and it represents multilevel hearsay. These circumstances emphasize the wisdom behind the procedural rules – limiting supplementation of the appellate record; deeming waiver or forfeiture of issues not raised in the trial court; and restricting the scope of appellate review – that are designed to confine appellate review to factfinding that occurs in the trial court. Because Appellants' complaint about the newspaper article was not properly preserved for appellate review, we deny the motion to supplement the record with this article and reject this point of error.

## C. Intrajudicial Bias

Notwithstanding the obstacle that Liteky presents to recusal claims based upon a judge's expression of beliefs arising from intrajudicial sources, Appellants press eight events that occurred on the record during judicial proceedings and which, they argue, support the case for recusal.

These events are, in chronological order, as follows:

1. When issuing his sentencing findings in the criminal prosecution of some Davidians, Judge Smith declared that the defendants and other adult Davidians "ambushed" and "conspir[ed] to cause the death of" federal agents on February 28, 1993. Appellants argue that these findings, made with respect to

convictions that were affirmed on appeal,[6] demonstrate his deep-seated antagonism toward the Davidians.

2. Judge Smith acquired over the course of the criminal proceedings a firm conviction that it was the Davidians who set fire to the living quarters at Mount Carmel on April 19, 1993, a belief he carried over to other cases tried before him, e.g. Risenhoover v. England, 936 F. Supp. 392 (W.D. Tex. 1996), and to the case at bar. (Appellants did not, however, appeal his finding to that effect after this trial.)

3. Judge Smith's comments in Risenhoover — that the Davidians were "soft as clay" and "easily manipulated," that their leader was a "false prophet" whose teachings focused on paramilitary training," and that their beliefs are "fanaticism . . . difficult for most people to understand" — made fair judgment impossible.

4. On June 27, 2000, when Appellants attempted to introduce the deposition testimony of Livingstone Fagan, Judge Smith referred — in an off-the-record bench conference — to Fagan, a resident of Mount Carmel who had previously been criminally tried and acquitted by Judge Smith, as a "crazy, murdering son-of-a-bitch"; he subsequently issued an inept apology.[7]

---

[6]United States v. Castillo, 179 F.3d 321 (5th Cir. 1999); United States v. Branch, 91 F.3d 699 (5th Cir. 1996).

[7]"That statement was off the record and in response to another lawyer's humorous suggestion, and was not in any way intended to be taken seriously. The Court regrets the slight to

5. On July 13, when Appellants attempted to introduce expert-prepared transcripts of the government's surveillance tapes, Judge Smith referred to these transcripts — in an off-the-record bench conference — as "bullcrap"; he subsequently admitted them.

6. Judge Smith presented the respective transcripts of the surveillance tapes to the jury in unfair manner: Appellants' transcripts were described as the work of Appellants' attorneys, whereas the government's transcripts were presented as the product of professional expertise. This characterization was especially galling to Appellants, as Judge Smith had previously allowed the government's "expert" to produce his transcripts after the court-ordered deadline, stating that compliance was not important, as his work was non-expert.

7. On July 14, in charging the advisory jury, he allegedly gave an improper standard for determining liability, refused Appellants' submitted instruction, and failed to include any instructions regarding liability for foreseeable acts of third parties. That this inadequacy was intentional, Appellants allege, can be seen by comparing these instructions with the precision of his charge in Risenhoover, a case in which government agents injured or killed in the February 23, 1993 conflict brought suit against a reporter, certain media organizations, and an ambulance

Mr. Fagan's Mother, should he have one." The judge forgot that Doris Fagan burned to death in the fire at Mount Carmel on April 19, 1993; her estate is a plaintiff in these proceedings.

26

company that had alerted the Davidians, in violation of Texas law, to the impending assault.

8. On April 4, 2002, Judge Smith refused to certify Appellants' Statement of Proceedings, a document attempting to introduce into the record (pursuant to Fed. R. App. P. 10(c)) several of Judge Smith's unrecorded comments during the trial. Appellants had submitted this memorialization in February 2002, over a year and a half after the alleged statements were made. They contend that Judge Smith's refusal to certify demonstrates his bias, as the government did not dispute the substance of the document.

The first six of these events represent the expression of "opinions formed . . . on the basis of facts . . . or events occurring in the course of the current proceedings, or of prior proceedings," and are the type of opinions/expressions that <u>Liteky</u> holds nearly exempt from causing recusal. Appellants contend that <u>Liteky</u> either does not apply or should not apply as rigorously when, as in this FTCA case, the judge is the factfinder. There is no support for this position legally or logically. Judges often find facts in performing their duties – in admitting evidence, in sentencing criminals, in ruling on motions, as well as in deciding bench-tried cases. <u>Liteky</u> draws no distinction based on the type of proceeding, and none is warranted.

The last two events are embodied in judicial actions that Appellants could have, but did not, appeal. Since one of these

27

involves the irrelevant advisory jury and one a grievously late attempt to create a factual record for appeal, to allow the judge's demeanor or actions in the two events a significant influence on our recusal decision would be grossly disproportionate to the legal implications of his actions.

Appellants rightly contend, however, that apart from its broad statement, <u>Liteky</u> acknowledges that rarely, events in court may "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." 510 U.S. at 555. Among the events cited above, only one – Judge Smith's ill-tempered references to Fagan – even arguably fall within that deplorable range. And those brief comments in the course of a decade of litigation refer only to one witness, not to the Davidians or Appellants in general or to the merits of their case. Moreover, <u>Liteky</u> states that "expressions of impatience, dissatisfaction, annoyance and even anger" do not establish bias or partiality. <u>Liteky</u>, 510 U.S. at 555-56.

## II. Other Issues

### A. The Andrade Appellants

The Andrade Appellants' opening brief raises only one issue: whether Judge Smith abused his discretion in denying their motion for recusal. Responding to the government's emphasis on their limited appellate gambit, Appellants offered in their reply brief a four-page account of eleven alleged trial errors, asserting

that many more could be documented.  Additionally, they argue that allegations of bias effectively relieve them of the obligation to charge error, presenting only one case, <u>Maurino v. Johnson</u>, 210 F.3d 638, 645 (6th Cir. 2000)("judicial bias infects the entire trial process"), in support of this proposition.

The Andrade Appellants are skillfully represented by experienced counsel who surely knew that in this court, briefing issues for the first time in a reply brief is not allowed.  <u>Lockett v. EPA</u>, 319 F.3d 678, 690 n.51 (5th Cir. 2003).  Neither thoughtlessly nor coincidentally did they attempt to show trial errors in such a way that, even if non-cognizable, the mere allegations could influence this court while depriving the government of an opportunity to respond.  We must infer from these tactics that Appellants concluded there were no colorable appellate issues concerning Judge Smith's rulings, as opposed to his alleged bias.

That Appellants apparently reached this conclusion is a testament, however unintended, to the judge's overall capability.  Real judicial bias, it is true, "infects the entire judicial process," <u>Maurino</u>, 210 F.3d at 645, but a harmless error standard of review applies nevertheless.  <u>See</u> <u>In re Continental Airlines Corp.</u>, 901 F.2d 1259, 1263 (5th Cir. 1990).  Appellants' argument for reversal is misplaced.

**B.    The Brown Appellants**

Notwithstanding the Brown Appellants' lengthy brief, we cannot discern an argument in law for the reversal of the district court's judgment.  See Cinel v. Connick, 15 F.3d 1338, 1345 (5th Cir. 1994)("A party who inadequately briefs an issue is considered to have abandoned the claim.").  Although the Magna Carta and Geneva Convention are venerated documents, citation of such sources without more does not suffice to demonstrate judicial error.  We admire the sincerity of the Brown Appellants' presentation but they offer no tangible ground for reversal of the judgment.

**CONCLUSION**

For the foregoing reasons, we find no basis for recusal of Judge Smith nor any other reversible error.  The district court's judgment in favor of Appellees is accordingly **AFFIRMED.**

Appellants' Motion to Supplement Record **DENIED** as to the newspaper article dated September 13, 2000; **GRANTED** as to the other items.